# In the
# United States Court of Appeals
## For the Seventh Circuit

————————

Nos. 07-1638 & 07-1639

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JOHN NEAL,

*Defendant-Appellant.*

————————

Appeals from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
Nos. 99 CR 15 & 00 CR 62—**John Daniel Tinder**, *Judge.*

————————

ARGUED OCTOBER 29, 2007—DECIDED JANUARY 10, 2008

————————

Before BAUER, RIPPLE and WILLIAMS, *Circuit Judges.*

RIPPLE, *Circuit Judge.* In 2000, John Neal pleaded guilty to six federal charges for which he was sentenced to 42 months' imprisonment and thirty-six months' supervised release. In September 2006, the Government petitioned the court to revoke Mr. Neal's supervised release. The district court granted the Government's petition and sentenced Mr. Neal to an additional 24 months' imprisonment. Mr. Neal now appeals his sentence. For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Mr. Neal's Convictions

In March 2000, Mr. Neal was charged in a thirteen-count indictment with conspiracy to defraud the United States Government, operating an illegal gambling business, money laundering and tax evasion.[1] Shortly thereafter, in April 2000, the Government, by information, charged Mr. Neal with an additional four counts of money laundering. Mr. Neal then entered a plea agreement with the Government on Counts 1 and 2 of the superseding indictment and on all four counts contained in the information. With respect to the counts charged in the indictment, the court entered its judgment on December 15, 2000, sentencing Mr. Neal to 42 months' imprisonment and 36 months' supervised release.[2] The court entered judgment on the counts charged in the information on the same day; that judgment also sentenced Mr. Neal to 42 months' imprisonment and 36 months' supervised release. Each

---

[1] The superseding indictment consisted of the following charges: conspiracy to defraud the Government of the United States, in violation of 18 U.S.C. § 371 (Count 1); operating an illegal gambling business, in violation of 18 U.S.C. §§ 1955 and 2 (Count 2); conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956 (Count 3); money laundering to promote illegal gambling, also in violation of 18 U.S.C. § 1956 (Counts 4 through 9); and tax evasion, in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2 (Counts 10 through 13).

[2] An amended judgment was entered on August 31, 2001; the amended judgment did not differ in any material respect from the original judgment.

judgment indicated that the sentences imposed were to run concurrently with the other.

## B.  Mr. Neal's Supervised Release

Mr. Neal served his sentence and began his term of supervised release on April 19, 2004. The terms of Mr. Neal's release included the following conditions: (1) "[t]he defendant shall not commit another federal, state, or local crime"; (2) "the defendant shall . . . submit [to his probation officer] a truthful and complete written report within the first five days of each month"; (3) "the defendant shall work regularly at a lawful occupation"; (4) "the defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer"; and (5) "[t]he defendant shall refrain from purchasing, delivering, repairing, or collecting monies from any video gambling machines similar to those of the instant Federal offense" and "is further prohibited from employing any individual to perform the job duties of delivering, repairing, or collecting monies from any video gambling machines similar to those of the instant Federal offense." R.94 at 3-4.

During the term of his supervised release, Mr. Neal became the target of a gambling investigation conducted by state excise police. On September 18, 2004, pursuant to warrant, state police conducted searches of Mr. Neal's home and business properties; the search uncovered large amounts of unreported cash as well as gambling machines and other gambling equipment.

Two days after execution of the warrant, the Government petitioned for revocation of Mr. Neal's supervised release. According to the Government, Mr. Neal had

violated each of the conditions of his release set forth
above. After the Government filed its petition, the State of
Indiana charged Mr. Neal with seventy-one violations of
state law involving illegal gambling, money laundering
and operating a corrupt business.

## C. Revocation Proceedings

On January 26, 2007,[3] the district court held a hearing
on the alleged violations. Mr. Neal admitted that he had
failed to submit truthful monthly financial statements to
his probation officer and that he had opened a new line of
credit. He requested, however, that the court continue the
revocation hearing on the other alleged violations pending
trial on the state offenses.[4] The district court refused and
heard evidence on the violations.

At the hearing, Mr. Neal's probation officer, Troy Adam-
son, testified that, although Mr. Neal had filled out
monthly reports, the information contained in the reports
was inaccurate. Mr. Neal's monthly reports listed only a
pension income of $5,988.42 per month, totaling $72,000
per year. However, Mr. Neal's federal tax returns listed
income in excess of $200,000 per year for 2004 and 2005.
Additionally, Mr. Neal's monthly report failed to identify
bank accounts with balances in excess of $1 million and
failed to reveal a large amount of cash—$1.6 million—
found hidden in Mr. Neal's home.

---

[3] The hearing originally had been scheduled for November 22,
2006, but was continued once over the Government's objec-
tion and was continued a second time by agreement of the
parties.

[4] Mr. Neal still has not been tried on those offenses.

Also at the hearing, Officer Monty McMahan of the Indiana State Excise Police testified that, in the spring of 2004, he had begun an investigation of possible gambling violations at two bars in Anderson, Indiana. As the investigation progressed, Mr. Neal became one of its targets. Officer McMahan testified that he personally witnessed eleven vehicles, owned or registered to Mr. Neal or to Video Services (a company owned by Mr. Neal), transporting gambling machines and making collections. Officer McMahan also testified to the actions of a man named David Snow. According to Officer McMahan, Snow would go into various establishments owned by Mr. Neal and would leave carrying a bag of money. In September 2005, as part of the investigation, an undercover officer, April Tackett, had a conversation with Snow. During this conversation, Snow related that he worked for Mr. Neal and that he had collected money from gaming machines at different establishments. Officer McMahan testified that Officer Tackett had observed Snow open the video machines at Dolenski's Bar on June 9, 2006, read the machine's meter and obtain $2,295 in payment from the bar manager. Officer McMahan stated that, when excise police pulled trash from Mr. Neal's residence on June 15, 2006, they discovered "what appeared to be a split sheet that contained meter readings from video gaming machines, and the split amount on that sheet was $2,295." Tr. (1/26/07) at 35.

Officer McMahan further testified as to his personal observations of events at Big Baby's Bar. Big Baby's liquor license had been suspended temporarily due to the presence in the bar of illegal gambling devices, which had been removed during the suspension. The day after the suspension ended, Officer McMahan observed nine video gambling machines being delivered to the establishment.

According to Officer McMahan, Mr. Neal was one of the incorporators of Big Baby's; the tax records for the business were sent to Mr. Neal's address, and the utility bills also were in his name.

Finally, Officer McMahan testified that, on September 18, 2006, state excise officers executed a search warrant at Video Services. Gambling equipment, slot machines, pull tabs and other gambling paraphernalia were seized during the search.

During the revocation hearing, counsel for Mr. Neal cross-examined the Government's witnesses.[5] However,

---

[5] As part of the cross-examination of Officer McMahan, Mr. Neal's counsel sought to elicit testimony concerning the activities of Mr. Neal's daughter, Vicky Massey, who was the owner of Muncie Coin, a business immediately adjacent to Video Services. The Government objected to this line of questioning. The court indicated that it "ha[d] no interest in Ms. Massey's state court charge." Tr. (1/26/07) at 57. Mr. Neal's counsel then attempted to make an offer of proof:

> Your Honor, we believe that if the witness was permitted to answer the questions, that he would testify that Muncie Coin is a separate entity. It was separately, as a part of this, investigated as part of the state investigation, and in fact there are similar state charges filed against Ms. Massey.
>
> We further believe, Your Honor, that the evidence would show that during the officer's investigation, he was not able to determine that video poker machine specifically used specifically belonged to either Mr. Neal or Video Services, Inc., and that they were unable to—they didn't make any effort to determine which entity owned the machines. They have taken the position, and that would be the end of my offer of proof.

(continued...)

Mr. Neal did not testify, nor did he offer any documentary or testimonial evidence in opposition to the revocation petition.

After the evidence was presented to the court, the Government argued that, upon the completion of his prison sentence, Mr. Neal immediately had returned to his gambling enterprise. The Government believed that a preponderance of the evidence showed that Mr. Neal had violated the five conditions of his supervised release alleged in the Government's petition. Furthermore, the Government argued that, given the nature and circumstances of the offense and the history and characteristics of the defendant, the court should impose a term of 36 months' imprisonment.

In reply, Mr. Neal's counsel conceded that Mr. Neal had violated the conditions of his release concerning opening lines of credit and reporting his income. Mr. Neal's counsel, however, stated that he believed that the court had

---

[5] (...continued)
*Id.* at 58-59. After further discussion, the court reiterated that it was "not trying the state [] case against any other defendant, or even this defendant" but was "just trying to determine whether by a preponderance of the evidence [the defendant has] violated any federal, state or local laws, or participated in an illegal gambling business." *Id.* at 60. By agreement of the Government, the court accepted that Vicky Massey owned Muncie Coin and that Muncie Coin also was in the business of supplying gaming machines. The court then indicated that Mr. Neal's counsel was free to inquire as to what the police "did or didn't do" to determine the ownership of illegal gambling machines, but restated that it was "not going to hear Vicky Massey's criminal case." *Id.* at 62.

hampered his efforts to refute the other alleged violations.[6] Counsel maintained that the Government's request of 36 months was excessive and urged the court to adhere to the guidelines range of 4 to 10 months. Counsel argued:

> [W]hile [the Government's counsel] didn't say these words, the impact of what she argues for is 36 months now, and then a lot more later on if he's guilty. It would seem to me, given the realities of the situation, that the court protect its interests, which could be served—satisfied in a number of ways other than a sentence of imprisonment: home detention, a shorter custodial sentence and the like.
>
> And then if Mr. Neal is guilty, the court trusts the state courts to impose a significant sentence for what the court, I think, believes to be the bad behavior. And it seems to me under those circumstances, justice is done.

*Id.* at 107-08. After hearing arguments, the court advised the parties that it would rule on the petition on February 5, 2007.

Three days after the hearing, on January 29, 2007, counsel for Mr. Neal filed a motion to reopen the evidentiary

---

[6] *See* Tr. (1/26/07) at 100 ("[A]s I understood the court's rulings, you did, because when we wanted to get into it with Officer McMahan, and when we wanted to get into it, you cut us off."). Counsel's allegation prompted the court to clarify its ruling: "What you were trying to do with the officer was—what appeared to be—was to discover what evidence they had against Vicky as opposed—if you want to offer proof of how the operation was run, have at it. I think that would be of great interest—." *Id.* at 100-01. Mr. Neal did not offer any additional evidence at that time.

hearing, to present additional evidence and to obtain discovery. Counsel requested that the State of Indiana be ordered to produce information from the state investigation, including undercover police officer investigative reports, surveillance reports and photographs, the results of the trash pulls, case notes of the investigative officers and all exculpatory evidence pertaining to the investigation of Mr. Neal.

The district court denied the motion for discovery but granted the motion to reopen the evidentiary hearing. The district court noted that "[t]he Defendant was given an opportunity to present evidence at the hearing and chose to do so only through cross-examination." R.36 at 1. After reviewing the discovery sought, the court reviewed the Supreme Court's decisions involving the rights guaranteed to defendants in revocation hearings, namely "notice of the claimed parole violations, disclosure of the evidence against the defendant, an opportunity to be heard and to present evidence, and the right to confront and cross-exam adverse witnesses." R.36 at 3 (citing *Morrissey v. Brewer*, 408 U.S. 471, 480 (1972)). The court further noted that "[t]he Defendant cites to no statute, rule, or case law that would . . . establish a right to the discovery he now seeks. . . . A general right to discovery of evidence— whether exculpatory or otherwise—was not one of the minimal due process rights identified in *Gagnon* [*v. Scarpelli*, 411 U.S. 778 (1973)] or *Morrissey*." *Id.* at 3-4. With respect to the discovery, therefore, the court held:

> [W]hat the Defendant is seeking by way of discovery appears to be far more than what he would be entitled to in a full-blown federal criminal prosecution. His cross-examination disclosed that he has already conducted some discovery (at least a deposition) in a pending state court criminal or civil matter related to

> the gambling allegations. He is submitting the current wide-ranging discovery request in the matter before the court very late in the process, after several continuances and after the evidence was closed. It also appears to the court that what the Defendant is seeking to accomplish through his requested discovery is to belatedly poke holes in the government's presentation after gaining the benefit of an extended delay subsequent to hearing that evidence. The combined motion (doc. No. 119) is accordingly DENIED to the extent it seeks discovery.

*Id.* at 4. However, the district court granted the motion to reopen the evidentiary hearing to allow the defendant to present evidence relevant to whether he had committed the alleged violations of supervised release.

At the reopened hearing, Mr. Neal presented the testimony of Officer Joel Sanderrfur of the Anderson Police Department, Stephen Pelletrino and John Snow. Officer Sanderrfur testified to his conversation with Snow after Snow's arrest; in that statement, Snow had told Officer Sanderrfur that he worked for Vicky Massey, but that "he had been inside Video Services and that he had taken money and placed it on a desk there." Tr. (2/5/07) at 9.[7] Mr. Neal then called Pelletrino, who testified that he owned a bar located on property previously owned by Mr. Neal. Pelletrino testified that he paid Mr. Neal in weekly installments for the purchase of the property; the payments were made in cash from the receipts of the bar.

---

[7] Mr. Neal's counsel also requested production of Officer Sanderrfur's notes that he had consulted in preparing for his testimony. The court sustained the Government's objection to the discovery of those notes.

He also stated that the bar had "amusement machines"—pool tables, a juke box and a video golf game—supplied by Video Services and gambling machines supplied by Ziggy's Amusement. Mr. Neal's final witness was John Snow. Snow testified that he had been employed by Muncie Coin to make collections on gambling machines. He further stated that all of the money collected went to Muncie Coin; Snow denied that he ever had told Officer Tackett that he worked for John Neal.

After presenting this evidence, counsel for Mr. Neal argued that the only evidence tying Mr. Neal to gambling activities was the alleged statement by Snow, which had been refuted. With respect to the violations concerning reporting and opening lines of credit, counsel believed that these violations warranted a sentence at the lower end of the guidelines range and that the "Court should fashion a sentence that allows Mr. Neal to be available" for the defense of his state court prosecutions and that took Mr. Neal's health conditions into consideration. In response, the Government argued that Snow in all likelihood had perjured himself, that the evidence showed that Mr. Neal had been operating an illegal gambling business "probably during the time he was in prison and certainly since he got out," and that Mr. Neal had accumulated between three and four million dollars in cash since the time he was sentenced on the original charges and had "offered no explanation for where that money came from." *Id.* at 56-57. The Government believed that Mr. Neal's violations were "significant" and urged "the Court to impose a very significant sentence." *Id.* at 57.

Before imposing sentence, the court explained how the reporting requirements were designed to alert the court to any possible criminal activity by tracking closely the amount and source of Mr. Neal's income. The court

stated that "the violations of the monthly reporting re-
quirements and the obtaining credit are serious in and of
themselves, given the context of this particular case and
the purpose for the regimen that was in place for this
defendant and would have deserved in and of themselves
a substantial period of incarceration." *Id.* at 59-60. The court
then recounted the other evidence presented at the hearing
and concluded that

> [t]he bottom line is that the preponderance of the
> evidence convinces me that Mr. Neal very shortly
> after completing his period of incarceration on this
> underlying case returned back to the very same gam-
> bling enterprise from which I attempted to remove
> him when I sentenced him in 2000. I infer from this
> evidence that in fact he's returned to his role as the
> invisible man. . . .
>
> . . . He's returned to gambling and not in a light way,
> he's not going down to some illegal card game. He
> returned to this machine gambling with a vengeance.
> He has flouted the requirements imposed on him. He
> acts as some sort of puppet master so he can operate
> these numerous locations, essentially just thumbing
> his nose at the law, at law enforcement, and at this
> Court.

*Id.* at 61-62. The court found that the Government had
proven by a preponderance of the evidence that all five
grounds of supervised release had been violated. The
court considered the policy statements set forth in the
sentencing guidelines at U.S.S.G. § 7B1.1 and the factors
set forth at 18 U.S.C. § 3553(a) in determining the sen-
tence. The court observed that

> [t]his particular offense is especially egregious. . . . The
> atmosphere in which this is done in this three or

four county area is notorious. It is very clear that Mr. Neal doesn't get it, and it is inspirational to others in a very negative way. There is simply no deterrence unless a substantial sentence would be imposed on this defendant, both specifically to him and generally to others.

*Id.* at 64-65. Although the court acknowledged that "the Government's request for the maximum 36 months sentence [was] well justified," the court imposed a sentence of 24 months' incarceration followed by an additional 12 months' of supervised release. *Id.* at 66. In doing so, the court considered Mr. Neal's "current age, his health and the need to have a punitive and deterrent effect." *Id.*

Mr. Neal timely appealed.

## II

## ANALYSIS

### A. Discovery

Mr. Neal first claims that his Fifth Amendment right to due process of law was violated when the district court denied his request for discovery. We review Mr. Neal's constitutional claim de novo. *See, e.g.*, *United States v. Ramos*, 401 F.3d 111, 115 (2d Cir. 2005) (reviewing de novo an alleged due process violation in context of supervised release revocation).

Following the Supreme Court's decisions, we have held that supervised release revocation hearings are not criminal prosecutions. *See United States v. Kelley*, 446 F.3d 688, 689-91 (7th Cir. 2006) (citing *Morrissey v. Brewer*, 408 U.S. 471 (1972), and *Gagnon v. Scarpelli*, 411 U.S. 778 (1973)). Consequently, the full panoply of rights that the Constitution

guarantees to criminal defendants does not extend to
individuals who are the subject of revocation proceedings.
Instead, in *Morrissey v. Brewer*, 408 U.S. 471, 485 (1972), the
Supreme Court set forth the more streamlined process that
is due to an individual already convicted of an underlying
crime, but in danger of losing his conditional liberty. The
Court stated that due process requires that a parolee be
given:

> (a) written notice of the claimed violations of parole; (b)
> disclosure to the parolee of evidence against him; (c)
> opportunity to be heard in person and to present
> witnesses and documentary evidence; (d) the right to
> confront and cross-examine adverse witnesses (unless
> the hearing officer specifically finds good cause for
> not allowing confrontation); (e) a "neutral and de-
> tached" hearing body such as a traditional parole
> board, members of which need not be judicial officers
> or lawyers; and (f) a written statement by the fact-
> finder as to the evidence relied on and reasons for
> revoking parole.

*Id.* at 489.[8] Although *Morrissey* involved a parole revoca-

---

[8] These guarantees are now codified in Federal Rule of Criminal
Procedure 32.1(b)(2). *See United States v. LeBlanc*, 175 F.3d 511,
515 (7th Cir. 1999) (stating that Rule 32.1 is a "codification of
*Morrissey*"). Rule 32.1(b)(2) states:

> **(2) Revocation Hearing**. Unless waived by the person, the
> court must hold the revocation hearing within a reasonable
> time in the district having jurisdiction. The person is
> entitled to:
>
> **(A)** written notice of the alleged violation;
>
> **(B)** disclosure of the evidence against the person;
>
> (continued...)

tion, the Supreme Court extended these protections to probation revocation proceedings in *Gagnon v. Scarpelli*, 411 U.S. 778 (1973). Similarly, we have held that *Morrissey* also sets out the due process requirements for purposes of supervised release revocation hearings. *See United States v. Kelley*, 446 F.3d 688, 690-91 (7th Cir. 2006); *see also United States v. Carlton*, 442 F.3d 802, 807 (2d Cir. 2006); *Barnes v. Johnson*, 184 F.3d 451, 455 n.7 (5th Cir. 1999).

Mr. Neal maintains that the district court violated these basic standards when it refused to order the Government to produce evidence that actually had been used against him. According to Mr. Neal, this evidence includes Officer McMahan's surveillance notes, Officer Tackett's reports and evidence taken from the trash pull at his home. Mr. Neal also argues that his due process rights were violated when the district court failed to order the Government to produce all exculpatory evidence. We address each of these arguments below.

### 1. Evidence Used Against Mr. Neal

Mr. Neal first maintains that he is entitled to officers' surveillance notes, to Officer Tackett's reports, to the physical evidence pulled from his trash and to case reports

---

[8] (...continued)

    **(C)** an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear;

    **(D)** notice of the person's right to retain counsel or to request that counsel be appointed if the person cannot obtain counsel; and

    **(E)** an opportunity to make a statement and present any information in mitigation.

of officers involved in the state gambling investigation. Mr. Neal believes that this evidence actually was used against him and, therefore, the Government had a duty under *Morrissey* and Criminal Rule 32.1 to produce that information.

None of the documents or physical items sought by Mr. Neal were introduced as evidence during his revocation hearing. Essentially, Mr. Neal's argument attempts to equate evidence that might be useful to the defense with evidence that actually was used by the Government in making its case. *Morrissey* requires disclosure of the second category, but not the first. The Ninth Circuit recognized this distinction in *United States v. Tham*, 884 F.2d 1262 (9th Cir. 1989). In *Tham*, the defendant's probation officer had testified at Tham's probation revocation hearing. The district court, however, denied Tham's request to view his probation file. On appeal, Tham argued that the district court's denial violated both Rule 32.1's requirement of "disclosure of evidence against the probationer," as well as his right to due process. The Court of Appeals rejected the argument on the ground that the file itself had not been used as evidence against Tham and that "Tham was provided the opportunity to cross-examine all witnesses, including his probation officer." *Id.* at 1265. Consequently, "no violation of the Rule or of due process" had occurred. *Id.* Similarly, none of the requested information was offered into evidence at Mr. Neal's revocation hearing, and Mr. Neal was provided with, and took advantage of, the opportunity to cross-examine the Government's witnesses.

Moreover, there is another reason that we must reject Mr. Neal's claim that he had a right to the requested discovery. Here, the evidence sought by Mr. Neal was

not in the hands of Mr. Neal's probation officer or any federal authority, but in the control of the state police. This court has held that Rule 16 of the Federal Rules of Criminal Procedure, which controls discovery in criminal prosecutions, "imposes upon the federal government no duty to obtain documents that are controlled by the state government or police, even if the prosecution is aware of the items." *United States v. Hamilton*, 107 F.3d 499, 509 n.5 (7th Cir. 1997).

## 2. Exculpatory Evidence

Mr. Neal also maintains that the court should have ordered "the State of Indiana ATC to produce . . . [a]ll exculpatory evidence pertaining to the investigation of John Neal." R.33 at 3. Mr. Neal acknowledges that this material is not evidence that was used against him, but nonetheless maintains that due process requires that the evidence be turned over to him. Mr. Neal claims that "[i]n the Eighth Circuit, there is clear precedent supporting the proposition that a defendant in Neal's situation would be entitled to the production of exculpatory evidence. *See United States v. Quiroz*, 374 F.3d 682, 684 (8th Cir. 2004)." We do not believe that *Quiroz* can be read to establish a general right to all exculpatory material in the context of release revocation hearings, much less a right to the material under the circumstances presented here.

*Quiroz* did not involve directly the question of a defendant's entitlement to exculpatory material in a revocation proceeding. The central issue in *Quiroz* was whether the district court abused its discretion in denying the defendant an additional continuance; the district court previously had granted several continuances for a total of

four months. Counsel for Quiroz had requested the contin-
uance after hearing the testimony of the Government's
sole witness—a customs agent who had interviewed
Quiroz after her arrest. Counsel claimed that additional
time was necessary to review the arrest report, the lab-
oratory report for the cocaine found on Quiroz and the
release violation report, all of which he claimed not to have
seen prior to the hearing, and none of which he had
attempted to obtain prior to the hearing either from the
Government or Quiroz's former counsel. As noted above,
the district court denied the continuance, and the Court
of Appeals for the Eighth Circuit affirmed. The circuit
court rejected Quiroz's claim that "she had a compelling
reason for requesting the continuance because she had not
been provided with the three reports and needed addi-
tional time to review these reports for potentially ex-
culpatory or impeachment materials." *Id.* at 684. The court
did not address the foundational question whether *Brady
v. Maryland*, 373 U.S. 83 (1963), applied in the context of
a revocation hearing. Without first making this deter-
mination, however, the court went on to state that there
was "no evidence whatsoever of a *Brady* violation, much
less any plain error regarding a *Brady* violation"; conse-
quently, the "attempt to show a compelling reason for the
requested continuance fail[ed]." *Id.* at 684.

Furthermore, even if we could read the Eighth Circuit's
opinion as establishing a right to exculpatory material
under some circumstances, we do not believe that the
decision supports Mr. Neal's particular claim to exculpa-
tory material. Mr. Neal's situation is remarkably similar
to that of Quiroz. Despite the lapse of four months be-
tween the filing of the revocation petition and the hearing,
Mr. Neal did not seek the court's assistance in securing

exculpatory evidence. Instead, Mr. Neal waited until the Government had presented its evidence at the hearing before he petitioned the court for discovery; the petition not only sought evidence, but "fourteen days to review and evaluate the evidence." R.34 at 3. Except for counsel's allegations in the discovery motion,[9] Mr. Neal made no effort to establish that there was exculpatory evidence to be gained. In short, Mr. Neal's discovery motion suffers from the same inadequacies in timeliness and proof as that rejected by the Eighth Circuit in *Quiroz*.[10]

---

[9] Counsel stated:

> 5. Production of these items would allow the defendant to demonstrate that McMahan was either overstating the evidence, at best, or misrepresenting the evidence at worst.

> 6. Additionally, these reports would assist the Defendant in demonstrating that there is simply no evidence linking him to the present distribution of video gaming machines.

R.34 at 2.

[10] Although Mr. Neal does not mention the case with respect to his argument on exculpatory evidence, he does cite one other case in which the question whether a defendant was entitled to the discovery of exculpatory evidence in revocation proceedings was squarely presented to the court. In *United States v. Dixon*, 187 F. Supp. 2d 601, 604 (S.D. W. Va. 2002), the court stated that, with respect to requests for discovery in the context of revocation proceedings, it did "not believe it appropriate to categorically refuse the compulsion of favorable evidence." *Id.* The court concluded that a defendant is entitled to discovery of exculpatory evidence in revocation proceedings if certain conditions are met. The first of these conditions is that "Defendant must make a timely request by written motion for favorable evidence well in advance of the hearing." *Id.* Mr. Neal, however, has failed to satisfy this requirement.

In denying Mr. Neal's request for discovery, the district court made clear that it considered Mr. Neal's request untimely and an effort to delay further his revocation hearing. R.36 at 4 ("He is submitting the current wide-ranging discovery request in the matter before the court very late in the process, after several continuances and after the evidence was closed."). The holding of *Quiroz* reflects a concern that requests for exculpatory evidence may be used as a means of manipulating the judicial process. In *Quiroz*, the court explicitly rejected a belated attempt by counsel to obtain evidence similar to that sought by Mr. Neal. Given the procedural inadequacies of his request, Mr. Neal has presented no support for his claim that he is entitled to exculpatory material. Consequently, we need not reach the substantive issue whether, and under what circumstances, an individual subject to revocation proceedings is entitled to exculpatory material.

**B. Sentence**

Mr. Neal also maintains that the sentence imposed by the district court was too severe. We recently confirmed that "a sentence imposed after the revocation of supervised release can be set aside only if it is 'plainly unreasonable.'" *United States v. Kizeart*, 505 F.3d 672, 673 (7th Cir. 2007). To reach a reasonable sentence, the district court must begin its analysis with the recommended imprisonment ranges found in U.S.S.G. § 7B1.4, but these ranges "inform[] rather than cabin[]" the district court's sentencing discretion. *United States v. Pitre*, 504 F.3d 657, 664 (7th Cir. 2007) (internal quotation marks and citations omitted). The court also must consider the sentencing factors enumerated in 18 U.S.C. § 3553(a). *See United States v. Carter*, 408 F.3d 852, 854 (7th Cir. 2005). As with an

initial sentencing decision, the court "need not make factual findings on the record for each factor"; however, "the record should reveal that the court gave consideration to those factors." *Id.*

In the present case, the district court employed the correct methodology in reaching Mr. Neal's sentence. First, the court noted the suggested guidelines ranges for Mr. Neal's violations. The two violations admitted by Mr. Neal, the requirement that Mr. Neal provide accurate financial reports and the prohibition on opening new lines of credit, are "Grade C" violations, *see* U.S.S.G. § 7B1.1(a)(3), and carry a recommended sentencing range of 3 to 9 months, *see id.* § 7B1.4. Additionally, the district court found that Mr. Neal had violated three other terms of his supervised release: committing another federal, state or local crime; being involved in video gambling; and being employed in an unlawful occupation. These additional violations are "Grade B" violations, *see* U.S.S.G. § 7B1.1(a)(2), and carry a recommended sentence of 4 to 10 months, *see id.* § 7B1.4.

The district court, however, then turned to the factors set forth in 18 U.S.C. § 3553(a). The court determined that the suggested guideline ranges did not account adequately for Mr. Neal's wanton disregard of the terms of his release and his blatant disregard of the law in resuming his gambling activities almost immediately upon his release from prison. *See* 18 U.S.C. § 3553(a) (requiring the court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"). The court also believed that his behavior was "inspirational to

others in a very negative way"—another factor set forth in § 3553(a). *See id.* § (a)(2)(B) (requiring the court to consider the need for the sentence "to afford adequate deterrence to criminal conduct"). The court further explained that "[t]here is simply no deterrence unless a substantial sentence [is] imposed on this defendant, both specifically to him and generally to others." Tr. (2/5/07) at 65.

The district court also considered factors set forth in § 3553(a) that weighed in Mr. Neal's favor, namely his age and health problems. *Id.* at 64. Taking these into account, and balancing them against the flagrancy of the violations, the seriousness of those violations and the need for deterrence, the district court imposed a sentence of 24 months.

As required, the district court consulted the Guidelines and then turned to the factors set forth in § 3553(a). Looking at those factors, the court determined that the suggested range of 4 to 10 months did not account adequately for the § 3553(a) factors. In light of the evidence against Mr. Neal, the district court's decision was not without support in the record, and its sentence was not plainly unreasonable.[11]

---

[11] Although not raised by Mr. Neal, we address one other issue with respect to Mr. Neal's sentence. During revocation proceedings, the Government requested that Mr. Neal be sentenced to 36 months' imprisonment, which was, according to its understanding, the maximum available sentence. The district court also, apparently, was operating under the assumption that the maximum possible sentence was 36 months. *See* Tr. (2/5/07) at 66. Although Mr. Neal argued that the alleged
(continued...)

_____

[11] (...continued)
violations did not "warrant a sentence of 36 months" or "even the high end of the recommended guidelines," *see id.* at 54, he never argued that the district court lacked the authority to sentence him to the full 36 months. He also has not raised such an argument in his brief on appeal.

At oral argument one of the panel members suggested that the district court may have committed plain error in the sentencing because, according to statute, the maximum penalty that could be imposed upon Mr. Neal was 24, as opposed to 36, months' imprisonment. In response to the court's inquiry, the Government reiterated its belief that 36 months was the correct maximum penalty, but also stated that it did not believe that the difference in maximum penalty would have altered the district court's sentencing determination. During his rebuttal time, Mr. Neal's counsel did not address the possible discrepancy in maximum penalties raised by the court.

We have reviewed this issue and conclude that the district court did not commit plain error in employing the 36-month maximum. As we have oft repeated, "under the plain error standard, the party asserting the error bears the burden of persuasion on the following points: (1) that there is error, (2) that the error is plain, and (3) that the error 'affects substantial rights.' " *United States v. Jumah*, 493 F.3d 868, 875 (7th Cir. 2007) (quoting *United States v. Olano*, 507 U.S. 725, 732-34 (1993)). "If these three conditions are met, the court may exercise its discretion to notice a forfeited error, but only if it (4) 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.' " *United States v. Day*, 418 F.3d 746, 750 (7th Cir. 2005) (quoting *Olano*, 507 U.S. at 732; additional quotation marks and citations omitted).

Applying this standard, it was error for the court to believe that 36 months was the maximum penalty. Section 3583(e)(3)

(continued...)

[11] (...continued)
provides that a court may revoke a term of supervised release, "and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release . . . except that a defendant whose term is revoked under this paragraph may not be required to serve . . . more than 2 years in prison if such offense is a class C or D felony." 18 U.S.C. § 3583(e)(3). The crimes to which Mr. Neal originally pleaded guilty were class C and D felonies. Consequently, the statute caps Mr. Neal's penalty at two years' imprisonment for each term of supervised release revoked.

However, although the cap for revocation of each term of supervised release is two years, it appears that Mr. Neal was serving concurrent terms of supervised release. *See supra* at 2-3. We have held that the "district court has discretion to impose consecutive prison terms upon revoking concurrent terms of supervised release." *United States v. Deutsch*, 403 F.3d 915, 918 (7th Cir. 2005). Consequently, the district court had the discretion to sentence Mr. Neal to two consecutive 24-month terms, for a total of 48 months' imprisonment.

In this case, even if the district court were limited to the cap for revocation of one term of supervised release, there is no indication in this record that the district court would have sentenced Mr. Neal to anything less than 24 months. The record is replete with statements by the district court noting Mr. Neal's blatant disregard for the law and suggesting that only a significant penalty would send a message to Mr. Neal and other individuals involved in illegal gambling activities.

Moreover, even if we were to conclude that error had occurred that affected Mr. Neal's substantial rights, we would be hesitant to exercise our discretion and recognize plain error in this context. Recently, our colleagues on the Eighth Circuit

(continued...)

---

[11] (...continued)

were faced with a similar circumstance when a defendant failed to raise an instructional error. That court observed:

> All of this said, we will not correct the error because of our view of the proper role of courts in an adversarial system. Deputy Kofka did not challenge the above-described aspect of the jury instructions before the district court, thus triggering plain error review, Fed. R. Civ. P. 52(d)(2); *Littrell v. Franklin*, 388 F.3d 578, 586-87 (8th Cir. 2004); *see United States v. Olano*, 507 U.S. 725 (1993), and he did not raise the matter on appeal. What is more, he did not adopt the argument when, at oral argument, we pointed out that the case appeared to have been submitted to the jury on an improper theory. He did little more than acknowledge that no one had noticed this problem. Though we can correct plain errors *sua sponte*, *see Silber v. United States*, 370 U.S. 717, 718 (1962), the amount of inaction in this case is too much for us to brook. To correct the error, we would have to notice *sua sponte* that the district court did not act *sua sponte* to provide a jury instruction that the defendant should have provided, and then we would have to remedy the problem in the face of the defendant's relative indifference to it. We have an adversarial system of justice, not an inquisitorial one, and to proceed along the path described above would be to blur the line between the two systems. We decline to do so.

*Swipies v. Kofka*, 419 F.3d 709, 717 (8th Cir. 2005). Mr. Neal has had ample opportunity to bring before this court any alleged errors in the district court's sentencing. Indeed, this court presented to Mr. Neal the possibility of plain error at oral argument, but counsel failed even then to argue the point.

Counsel's decisions not to raise the issue either in the district court or in this court may have been conscious ones: Mr. Neal

(continued...)

## Conclusion

For the reasons set forth above, we affirm the judgment of the district court.

AFFIRMED

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

---

[11] (...continued)
may have been reluctant to challenge the district court's assumption of a 36-month cap for fear that the court may realize that it had an even greater maximum within which to work. Alternatively, Mr. Neal may have decided not to pursue this argument on appeal because, given the court's strong statements regarding the seriousness of the violations and the need for deterrence, he did not believe that there was sufficient evidence in the record to support a finding that the district court would have sentenced Mr. Neal differently. Given the absolute failure to bring the issue of an incorrect maximum sentence to the court's attention, and the possibility that the decision could have been made as a matter of strategy, we do not believe that this is an appropriate case in which to exercise our discretion to recognize plain error.